Council, before you proceed, Justice Hudson had to leave the bench here, but he will have the full benefit of your oral argument, because it is being taped, and of course he has the full benefit of your written briefs, and will be a fully participating member on your case. Counselor, you may proceed. May it please the Court, my name is Jonathan Mitchell, I'm an attorney at Byron Major Green Ryan, and we represent the appellant, Gilster-Mary Lee Corporation, in this case. Your Honors, there is one issue that we brought on appeal, and that's whether the Commission erred in finding that Mr. Peterman's current condition, and the award of prospective medical treatment, arose out of it in the course of his employment at Gilster-Mary Lee, and it's our position that his current condition arose out of it in the course of his employment with his current employer, PTI Trucking, and not with Gilster-Mary Lee Corporation. Also, as a sub-issue, is whether the failure of the Commission to find that Mr. Peterman had an independent intervening cause of injury that was contrary to what the Commission determined, whether or not there was an independent intervening cause? Well, it could be, yes, Your Honor, it could be a factual question. In this case, we think the facts are not in dispute. There is no dispute of fact as to the fact that his doctor, Dr. Calfee, told Mr. Peterman that he was completely clear to return to work with no restrictions. From that point on, he got a job with PTI Trucking. That's not in dispute. Six weeks after working for PTI Trucking, he began to have problems with his elbows and his arms that when he before had not been working for PTI, he wasn't having. And then he continued to work for another six weeks, and those problems became worse. He worked for another six weeks, and they became worse, and the doctor finally took him off work and has recommended he have surgery. Those facts are not in dispute. So your argument is that there are no disputed inferences, those facts are undisputed, and so we should engage in de novo review on that issue. That's correct, Your Honor. From that point forward, now, we do recognize that Mr. Peterman, during arbitration, said that his symptoms had not totally relieved. He was still feeling some tingling. That fact is in dispute. We think that what he told his doctor... And those are facts that the Commission could consider in determining that there was no independent intervening cause, right? Potentially, that's correct. I mean, aren't you kind of cherry-picking the facts that you say are undisputed in order to try to gain de novo review? Well, if you look at it that way, I'm not going to deny that it could be, but I think that that is a case in which the court can use de novo review because there was no case law that I've found, or that any of the attorneys in our office have found, that addressed a specific issue where we have a repetitive trauma that leads to recovery, followed by the exact same employment repetitive trauma that leads to a new issue of whether that was the injury. So, of course, the claimant wants to say this is the same injury, this is the natural flow, but we don't think the evidence supports that. I mean, the evidence really shows that he treated, he recovered, his doctor was very conservative. Dr. Calfee continued to see him over several months, ultimately said, alright, I think you can return with some restrictions. You need to wear a wrist splint, and then he came back a month later and Dr. Calfee said, alright, I'm not going to release you because you have a knee injury from a car accident that was not related to drug driving, but as far as the risks go, you're totally released to return to work with no restrictions. Does that mean he's 100% cured? Well, we think that he's 100% cured, but at least maximum medical improvement to the point that Gilstrom-Mary Lee should not be responsible when he engages in a job that does the exact same repetitive conduct that caused the injury. And we believe that is the independent intervening act that a court has not previously addressed, which is he knows that drug driving causes problems with his elbows, he received treatment for those problems, his doctor treats him over the course of several months, ultimately releases him with no restrictions. So when he steps into a new truck, and he's been released with no restrictions, and his condition starts to go downhill after he had reached maximum medical improvement, that that is an independent intervening accident. Now it took me a while to get my brain around the idea that... Basically the exact same repetitive trauma accident that he had before. Correct, but with a different employer. In a different truck with a different employer. That's exactly right. And that's our position on the independent intervening act. This issue was addressed by the National Parade Court. So National Parade versus Illinois Workers' Compensation Commission, it was an individual who was unloading boxes, he felt pain in his back, he was receiving treatment for that pain, he had shooting pain that went down one leg, he was in a car accident, and he had shooting pain that went down the other leg. And the court looked at really did accident two cause new symptoms? Did accident two increase the symptoms? Did accident two result in a recommendation of a more involved surgery? They also said consider, did the symptoms change or increase? Was there a change in pathology? Did the treatment change? And did the ability to work change? All of those factors fit Mr. Peterman's situation when he started working with PTI trucking. Accident two caused new symptoms. Now they were similar, but he was doing the exact same repetitive conduct. So it would make sense that the pathology is not going to change. But if he's at maximum medical improvement after improving... When you just use the term it caused new symptoms, what you're saying is the same symptoms came back. The same symptoms came back. And they weren't different symptoms. That's correct. And we recognize that that is our most difficult element under the National Parade standard. But all, and I do want to point out, generally in this case we've lumped the right arms and left arms together. But clearly his right arm started experiencing different symptoms because he was diagnosed with right tennis elbow that he had never been diagnosed before by Dr. Calfee. And that wasn't until he started working for PTI. He had never had right tennis elbow while he was a truck driver for Gilcher, Maryland. I'm curious as to manifestation date. I've seen May 10th and May 11th interchangeably here in the briefs. Arbitrator found May 10th. What is the actual manifestation date? I think May 10th is fine as far as the manifestation date with Gilcher, Maryland. And just to quickly go through the timeline. So we're not disputing, although at one point we did dispute that he had cubital tunnel syndrome from being a truck driver. That was in dispute up to this point. We're not disputing that now. We are acknowledging that he had cubital tunnel syndrome from driving at Gilcher, Maryland. The manifestation date is May 10th. But he treated for that, and he recovered, he improved, and he reached maximum medical improvement. And Dr. Calfee released him with no restrictions, not even the splint. The prior treatment, just a month before he said, all right, you can go back to work, you can wear a splint on your left wrist. When he reached November 2011, Dr. Calfee said, you can go back to work and you don't even have to wear a splint. And at that point, a month later, he got a job with PTI Trucking. So being released with no restrictions whatsoever related to his arms, he starts truck driving for a different company, and he starts going downhill. He's doing the exact same thing, the exact same repetitive conduct. That repetitive conduct with a new employer is the independent intervening action that caused this increase in symptoms. It didn't have anything to do with what he had done with Gilcher, Maryland. He treated for that and recovered. So what has happened is the Commission has now put the perspective medical treatment on Gilcher, Maryland. We think it's just flatly unfair because this new injury from PTI Trucking, doing the same thing that he did with Gilcher, Maryland, that led to the new cubital tunnel, should be on PTI. It should not be on Gilcher, Maryland as far as paying for that future treatment. It's the same, exact same analysis that National Freight. Now there are other cases that look at the independent intervening cause. In all of those cases, and they're cited in our brief, some of them are really unfortunate for the claimant, for the amount of damage they went through. I'm going to use the Vogel case as an example. Mr. Vogel was moving a whirlpool and he tripped and he injured his back. While he was treating for that, he was in three separate car accidents where he also injured his neck and back in those car accidents. And the employer argued this should be an independent intervening act. And the court held that it wasn't because he was in a weakened condition. So they said if it's the natural flow of the conduct that arises out of and in the course of his employment, and there's other things that make it worse, that is still on the employer. But that's different than what we have with Mr. Peterman. Mr. Peterman wasn't in a weakened state. Now at one point he was weakened, but he had recovered. And Dr. Halpy had said, you are fully released and returned to employment. And then he goes and works for a new trucking company doing the same repetitive conduct. So he wasn't in this weakened condition. He was actually as good as he was going to get. He was at maximum medical improvement. The Vogel court, in the last paragraph before they reached a conclusion, I think is really the strongest language. It says, when circumstances in cases where the claimant had returned to work after receiving treatment for the work injuries, had been working for several months at the time of the second accident, the causal chain may be broken. And that's what we had. We had Mr. Peterman who, after treatment, went back to work. Several months passed. He started to have symptoms, tingling in his fingers. He continued to drive. That tingling then progressed to full-blown cubital tunnel syndrome, all while he was working for PTI Trucking. It could not have been in the course and in the scope of his employment appeals for Mary Lee, because all of this developed, the second injury developed, while he was with PTI Trucking. The other cases are also distinguishable on their facts, in which the courts have found that there is not an independent intervening act. In those cases, the claimant was still in this weakened state. They had not reached maximum medical improvement. Now, the doctors don't talk about maximum medical improvement in this case. They weren't asked specifically, is he at maximum medical improvement? And they weren't asked specifically whether this was an aggravation. So we have to look at the medical records. And Dr. Coffey's medical record shows return to work with no restrictions. And each of the documents on the months before that, he had slowly decreased the restrictions to the point that it was return to work with no restrictions. So to now say, after he, two months later, and drives for another company for 18 weeks, doing the exact same repetitive conduct that is the repetitive trauma, should be Gilstrom-Mary Lee's responsibility, we think that that is clearly in error. I do believe the court can look at it de novo. But even if the court believes it's manifest way, we think the decision was clearly against the manifest way of the evidence. Thank you, Your Honor. Thank you, Counsel. Counsel, you may respond. Thank you, Your Honor. May it please the court, my name is Michelle Rich. I'm here for James Peterman in this case. Justice, I think some of the comments that you made and some of the questions that you asked hit upon a lot of my argument today. I think that the respondent is cherry-picking facts in this case. I think this is a completely factual argument that they are making. This is within the province of the commission. You heard counsel say the words, we can state. I don't even know how many times I've heard that. I don't know how many times that we need to look to the medical records to determine how Mr. Peterman was doing. He seems to think that because he was released, returned to work with no restrictions, that this man doesn't have any symptoms anymore. That's just not true if you look at the record and the evidence. Mr. Peterman testified at trial unequivocally, which was unrebutted, that he still had symptoms. They never went away following the first surgery. If you also look at Dr. Kalfi's records before he started work with this new employer, you can see that that's also, in fact, the case. So I think what they're doing here is exactly what you said. They're trying to get you to ignore certain facts that are in the record to try to somehow apply that to a de novo review, and that's just not the case. There's specific case law that I cite in my brief that says that whether an intervening accident has occurred is a question of fact for the commission. That's the Bell and Gossett case. It's cited on page 22 of my brief in this case. So let's take a look at the medical records for a second and see exactly what they do say and how I think that that supports the commission's decision in this case. Mr. Peterman underwent cubital tunnel releases and tennis elbow surgeries on the left in April of 2011, and then in June of 2011 he underwent the right side. So how does he do following these surgeries? In July of 2011, he reports tingling in his small fingers, explains that Dr. Kalfi explains to him because of the procedure that he had, he had an ulnar nerve decompression, and because he did not perform a transposition on the ulnar nerve, that he may still have symptoms when he rests his elbow on specific surfaces. He even talks about activities that he may do at home that aggravates this, as well as activities that he performs maybe even when driving a truck. So he's talking about in July of 2011, try not to rest your posterior medial elbow on the edge of the table, chair, or truck door. Then in October of 2011, again this is still before he obtains the second employment with this other employer in December of 2011, he reports aching in the left elbow and the lateral aspect with lifting palms down. He doesn't have any pain when he's at rest, and his pain is overall less than before surgery, but still gets pain with lifting palms down. He says, for now, I would not recommend doing anything more aggressive. So your honors, this is not a man who has typical recovery from cubital tunnel surgery in which he reports that his symptoms have completely resolved. It's documented in the records. He's still going to the doctor complaining of these problems even before he takes this other job. And I think it's also noteworthy to point out in Dr. Kalfi's records, every time he characterizes these symptoms that Mr. Peterman's having, he calls them persistent, recurrent. He doesn't use the word new once with regard to the left cubital tunnel, which is what's being recommended for the revision surgery on that side, the prospective medical care and treatment that we're asking the court to award today. I think he does say he's having newer symptoms on the right side, but at this point there's nothing being recommended for him on the right side. All of his problems are on the left side. He gave him some home exercises and stretching to do for the right side, which took care of his problem. So all of the complaints with regard to the left are described as recurrent and persistent in Dr. Kalfi's records. It's not characterized as new at all, which is how counsel is painting this picture for you and how they make numerous references to the word new symptoms in its brief. That's just simply not supported by the medical records in this case. The case law tells us that an intervening accident has to completely break the causal chain and weakened state. I think that that's important. This man clearly was in a weakened state, as the courts have found in those numerous other cases. He still had symptoms. He wasn't cured from the effects of his injury. And Dr. Kalfi notes that in his records and in his deposition. He says, I think he needs to have his ulnar nerve transposed because that's part of his problem. That wasn't done the first time and that needs to be done now. So it's the same treatment that's being recommended. It's not like the cases that counsel pointed out where completely different treatment is being recommended in a national freight case. This is the same essential treatment. It's just a revision surgery. It's not anything new that's being recommended at this point. So I think the Vogel case is on point. He was clearly in a weakened state before he even took this job. And also from a practical standpoint, what would my manifestation date have been if he would have filed a claim with this new employer? His first date of work for the new employer? The new employer's argument, of course, would have been, well, you did all this work before. That was clearly causing and contributing to your problem. You can't say that this was caused from one day on the job working for us, clearly. So I think that the Commission's decision also makes sense from that practical standpoint as well. Another important thing to note is that the courts have often said in repetitive trauma cases specifically that recovery is granted against the employer on which the claimant's injury manifested itself. That's the ACNS case. The manifestation date is not in dispute. It's May 10, 2010 in this case. That's not disputed by respondent in this case. So according to that case law, when it comes to repetitive trauma injuries, liability is fixed against the employer who he was working for when his injuries manifested, which in this case was clearly Gilstrom-Marywood. I think it's clear if you look from the records that this man's symptoms never went away. They did become worse when he worked for this other job. I don't think I can dispute that. It's clear that when somebody goes back to work doing the same thing that injured them in the first place, their symptoms are going to be aggravated. But that doesn't break the causal chain in this case, and it does not relieve Gilstrom-Mary Lee of liability in this case. So we would ask you to affirm the decision in this case, which was originally imposed by the arbitrator, affirmed by the Commission and the Circuit Court. I think if there are no questions, that's all I have. I don't believe there are. Thank you, Counsel. Thank you. Counsel, you may reply. I just have a few points, Your Honors. Counsel went through the timeline of the treatment, which we agree with. We don't think that's really in dispute as far as the treatment. But I want to add a few points. It's in the record, and this is from Dr. Calfee's medical notes. On October 19, 2011, he indicated that Mr. Peterman had totally recovered from the cubital tunnel. On November 21, Dr. Calfee wrote, he may return to work without restrictions. So when the Court is looking at this, it really comes down to was he completely at maximum medical improvement, or was he still injured and he'll be aggravated at a later point? Did he aggravate a pre-existing injury? There's no indication that he aggravated a pre-existing injury when it was totally released with no restrictions, except for the fact Mr. Peterman says so. Mr. Peterman only said so during arbitration. When he met with his doctor, he said, I don't feel any pain. When he met with the IME doctor, Dr. Crandall, he said it all went away and then it came back. On that same date, October 19, 2011, don't Dr. Calfee's medical records show that the claimant told him that he had aching in his left elbow when driving? Yes, Your Honor. So he didn't say, I have no pain. No, and that's exactly right. And I think that's part of the cycle. It wasn't until November 21 where he was totally released and Dr. Calfee doesn't mention anything about pain. So from that point, we think the maximum medical improvement is November 21, 2011, and he starts his employment with PTI Trucking in December 2011. He hadn't worked for Gilster Mary Lee since July 2010. So he's had a couple of years that he's been treating and recovering, and then when he gets to that finally November 21, and Dr. Calfee says, no restrictions. You may still have some problems with your knees, which was a separate incident altogether. So no restrictions related to your elbows, and then he goes to work with PTI, and he immediately makes a downward spiral, but that's because it's the exact same repetitive trauma, activity, and movements that he'd had a problem with before with Gilster Mary Lee. Ultimately, your honors, we think that this is an independent intervening act. We don't think it's been addressed before by the court, where we have repetitive trauma, maximum medical improvement, followed by repetitive trauma. We believe that the facts as to that piece are not in dispute, and you can look at it at the no vote review. We think the commission would ask it to reverse. Thank you, counsel. Thank you, counsel. Thank you both for your arguments in this matter this morning. It's taken on an argument and a written dispositional issue. The court will stand in recess until Wednesday morning at 9 a.m.